James Murray **TIPTON**, a minor, by and through his father and next friend, Leonard Tipton; and Leonard Tipton, Individually, Appellants,

v.

Connie Jean **MULLINIX**, Appellee.

No. 45090.

Supreme Court of Oklahoma.

April 3, 1973.

Fischl, Culp & McMillin, by Terry C. Kern, Ardmore, for appellants.

Foliart, Mills & Miemeyer, Oklahoma City, for appellee.

LAVENDER, Justice:

This case arose out of a collision in an intersection in the City of Ardmore, Oklahoma, between a motorbike and an automobile. The bike was being driven by a 14-year-old boy named James Murray Tipton; the automobile was being driven by a 16-year-old girl named Connie Jean Mullinix, who was the defendant below and is the appellee herein.

The boy and his father, Leonard Tipton, joined as plaintiffs in a suit against the girl, with the boy, acting through his father as next friend, seeking damages for pain and suffering and permanent injuries, and the father seeking judgment for damage to the bike and for medical expenses incurred as a result of the boy's injuries.

Trial to a jury resulted in a verdict and judgment for the defendant. After the overruling of their motion for a new trial, the plaintiffs appealed to this court.

The appeal was assigned to the Court of Appeals, Division No. 1, for opinion. In their briefs, the plaintiffs contend and argue only that the trial court erred in giving an instruction (No. 12) on unavoidable accident because, they say, there was no evidence upon which a finding of unavoidable accident could be based or sustained, and also erred in giving an instruction (No. 14) which applied an adult standard of care to the 14-year-old driver of the motorbike (as well as to a 16-year-old driver of an automobile), instead of applying it only to the 16-year-old driver of the automobile.

The Court of Appeals denied the plaintiffs' contention concerning the standard of care required of 14-year-old drivers of motor-driven cycles on the highways, but reversed the judgment for the defendant and remanded the cause for a new trial on the stated bases that the evidence would not warrant a finding of unavoidable accident, and that it appears reasonably certain from the record that the jury was confused by the instruction on unavoidable accident, to the prejudice of the plaintiffs.

That court denied the defendant's petition for rehearing with respect to that portion of the decision involving the instruction on unavoidable accident, and she seeks certiorari from this court. We grant certiorari, reverse the Court of Appeals' decision that the trial court committed reversible error in instructing the jury on unavoidable accident, and affirm the judgment of the trial court.

There is no dispute about some of the pertinent facts. The collision involved a 1967 Thunderbird automobile belonging to the defendant's parents and being driven by the defendant, and a 1968 Honda "motorbike" purchased by the minor plaintiff's father and being driven by the boy. It occurred shortly before 5:50 p. m. on Saturday, September 21, 1968, in the intersection of 8th Avenue Northwest and Hargrove Street in the City of Ardmore. Each of those streets is about 24 feet wide and the speed limit on both streets was 25 miles per hour. At that intersection, Hargrove, a north-south street, is a through street with traffic on 8th, an east-west street, being controlled by a stop sign on each side of Hargrove, near the inner sidewalk line. A light rain, or mist, had started about 10 minutes before the collision and both streets were wet, but it was still daylight at the time of the collision. The car approached the intersection from the north ·

on Hargrove. The bike approached the intersection on 8th Avenue. The point of impact, between the left-front corner of the car and the left side of the bike near the center, was near the center of the intersection but in the southwest quarter of the intersection. In some of his questions, counsel for the defendant assumed, without objection by the plaintiffs, that the block north of 8th, between 8th and 9th, on Hargrove is 300 feet long.

The accident was investigated by an Ardmore police sergeant who had had two weeks special training in accident investigation at the University of Oklahoma and, at the time of the accident and for about two years prior thereto, was assigned to the traffic division, the duties of which were mostly investigation of traffic accidents. He received a radio call in his car and, two minutes later, at 5:50 p. m., was at the scene of this accident. The bike was on its side, south of the intersection, in Hargrove, about 30 feet southeast of the point of impact as determined by him from the debris. The Thunderbird was on the west side of Hargrove, about 75 feet south of the point of impact. Miss Mullinix told him she had moved the car after it stopped, but didn't say how far she had moved it. It had left no skid marks. She told him she had been going south on Hargrove at about 20 miles per hour, but had dropped to about 15 miles per hour before reaching the intersection. She said she could not tell which way the bike was going because she had not seen it until right before the collision. She did not say whether the boy had, or had not, run a stop sign.

The officer talked to the boy in the emergency room at the hospital some 30 to 45 minutes after the accident. The boy said he was traveling from west to east on 8th and was going about 10 miles an hour at the time of the collision. Asked when he first saw the car before the collision, the boy said he didn't see it. From his investigation at the scene, the evident point of impact, the place where the bike came to rest after the collision, as well as the

boy's statement, the officer determined that the bike was going from west to east on 8th Avenue. On cross-examination, he said that the bike would have ended up southeast of the point of impact if it had been going from east to west and the rear-end swerved across the center-line in front of the south-bound car in attempting to turn to the right.

According to the boy's testimony, he lived with his parents on C Street, which is east of Hargrove, and had a Daily Oklahoman route some distance west of Hargrove. On the afternoon of the collision, he had been collecting from his paper customers, when it started misting, or sprinkling a little bit, so he started home on the bike. He was wearing a motorcycle helmet with a water-repellant face shield. He approached Hargrove from the west, came to a complete stop at the stop sign on the west side of Hargrove, looked both ways and saw the car involved in the collision heading south on Hargrove at 9th Street, and thought it was entering Hargrove from the west on 9th. Then, he said, "I reached down to turn my gas up on reserve, getting low on gas, and I revved it up to make sure it didn't cut out on me, and looked back up and she was about two or three car lengths into the intersection, or into the road" (which he explained as two or three car lengths south of 9th on Hargrove), "so I took off and had time to make it and got over there and thought I had it made and I heard some water and I heard the car just a second and then it hit me and that's when it collided."

There were some trees at "the first end" of the block, but they had not prevented his seeing the car at 9th and two or three car lengths south of 9th. He had not seen the car again before the collision and could give no estimate of its speed. He said he could not have been going over about 10 miles an hour because he was in low gear.

According to the boy, the bike ended up in the street, next to the curb, near the southeast corner of the intersection, and he landed farther on in a yard. He was un-

conscious for a little while, but didn't know how long. He was taken to the hospital by ambulance. Among other things, his left leg and left thumb were broken and he had pain in his lower back. They gave him some shots. He did not talk with the policeman at the scene of the accident but talked with him at the hospital, answering questions about his driver's license and how the accident happened, after having the shots. He did not tell the policeman that he did not see the car at all before the collision.

He did not get to examine the bike until he got out of the hospital, 41 days after the accident. In addition to a "busted" engine, a "messed up" seat, and bent handlebars and rear fender, the gas tank was dented on the left side, the frame was bent from the left side, the left-rear shock absorber, the battery and step bar, both located on the left side of the bike, were messed up, and the muffler and muffler shield, located on the right side of the bike, were bent.

The boy was not asked, and did not mention, whether the lights on the bike were on prior to, or at the time of, the collision.

The defendant testified that she lived with her parents on the corner of 11th and Burch, one block west of Hargrove. When she left home to drive downtown to look for some material, it was misting, so she turned on the windshield wipers and parking lights. She drove east on Hargrove, she was driving about 20 miles an hour but, as she approached 8th Avenue, she let up on the gas pedal and decreased her speed to about 15 miles an hour, because there were so many trees and shrubs near that intersection it was hard to see, and, before she knew it, the rear end of the bike had slid around and hit the left-front corner of the car.

She said that the bike was traveling from east to west and because, when she first saw it, it was going so fast—15 to 20 miles an hour—it could not have stopped at the stop sign on the east side to Hargrove; and that, as it neared the middle of the in-

tersection, it turned to the right and the back end slid across the center-line of Hargrove in front of the car and hit the left-front fender of the car. Apparently this testimony was based entirely upon the fact that (according to repeated statements by her) the girl never did see the bike until a split second before the impact. She said that, at that time, she caught a flash of the bike a little to her left with its rear end just in front of the left-front corner of the car. She said she stopped the car about 10 feet south of the intersection, but did not say which end of the car was 10 feet from the intersection. A photograph which, she said, showed the condition of the car immediately after the collision, showed some slight denting or damage to the front of the left-fender area and a vertical dent in the side of that fender, just forward of the wheel opening.

Photographs showing the locations of the stop signs with relation to the curblines of Hargrove indicate that each of them was approximately 6 feet from the curbline.

The police officer and the boy made chalk-marks on a blackboard drawing of the intersection to indicate the point of impact, but the record does not disclose the exact location of that point in the southwest quarter of the intersection.

■ 47 O.S.1961 (and 1971) § 11–403, pleaded by the plaintiffs, provides, in subsection (b) thereof, that:

"Except when directed to proceed by a police officer or traffic control signal, every driver of a vehicle approaching a stop intersection indicated by a stop sign shall stop as required by section 11–703(d) and after having stopped shall yield the right of way to any vehicle which has entered the intersection from another highway or which is approaching so closely on said highway as to constitute an immediate hazard, but said driver having so yielded may proceed and the drivers of all other vehicles approaching the intersection shall yield the

right of way to the vehicle so proceeding."

The definition of the term "highway," as used in the Highway Safety Code, would include a city street. 47 O.S.1961 and 1971 § 1–122.

There is evidence which, with the inferences reasonably to be drawn therefrom, would support a finding of negligence on the part of the minor plaintiff in this case, which caused, or contributed to, the collision. The evidence is not such that all reasonable men would have to agree that the collision was the result of, or was contributed to by, negligence on the part of the defendant. A finding that the collision was an unavoidable accident would, of necessity, include a finding that both drivers were free of negligence, but the result would be the same as a finding that the defendant was not guilty of any negligence or a finding that negligence on the part of the boy resulted in, or contributed to, the collision—a verdict for the defendant.

█ As in Teague v. United Truck Service et al. (1972), Okl., 499 P.2d 380, 384, we cannot say it appears reasonably certain from the record that the jury in this case was, by reason of the giving of the instruction on unavoidable accident, misled to the extent of returning a verdict that it otherwise would not have returned. The Court of Appeals erred in holding that the giving of an instruction on unavoidable accident was error, prejudicial to the plaintiffs, and, based thereon, in reversing the judgment for the defendant and remanding the cause for a new trial.

█ However, it appears that the Court of Appeals was correct in applying to a 14-year-old driver of a motor-driven cycle the same standard of care—an adult standard of care—that this court, in Baxter et al. v. Fugett, Guardian ad Litem, et al. (1967), Okl., 425 P.2d 462, held applicable to a 16-year-old driver of a motor vehicle of the type commonly known as an automobile. As pointed out in that opinion, the Highway Safety Code (47 O.S. 1961 § 1–101 and following) applies to *every* person, regardless of age, while driving a "motor vehicle" on any highway in this state. The term "highway," as used in the code, means "The entire width between the boundary lines of every way publicly maintained when any part thereof is open to the use of the public for purposes of vehicular travel" (Section 1–122). According to Section 1–136, every "motor-driven cycle" equipped with a motor which produces not to exceed five brake horsepower at full throttle without a governor as determined by a dynamometer test and designed to travel with not more than three wheels in contact with the ground, is a form of "motorcycle," as that term is defined in Section 1–135, and would come within the definition of the term "motor vehicle" set forth in Section 1–134. Like an automobile, every "motorcycle," regardless of the horsepower of its motor, and regardless of the age of its driver at any given time, is a "motor vehicle" within the meaning of that term as used in the Highway Safety Code.

█ Like the Court of Appeals, we fail to see how a "special or restricted license," issued under subsection (d) of Section 6–107 of that code, to a 14- or 15-year-old person could have the effect of relaxing, in any manner or to any extent, the adult standard of care required of every person while driving any "motor vehicle" on any "highway" in this state.

The decision of the Court of Appeals, insofar as it holds that the trial court committed reversible error in giving the jury an instruction on unavoidable accident, reverses the judgment of the trial court, and remands the cause for a new trial, is reversed.

The judgment of the trial court is affirmed.

All of the Justices concur.